The Plaintiff contends that the trial court erred in granting a summary judgment in the matter of Josette Ripoll v. the Recovery School District of Louisiana. There is one or more genuine issues of material fact as to whether the Recovery School District, reasons given by the district, were just pretextual. Plaintiff has produced strong evidence to show that the defendant's profferent reason were either false or unworthy of credence. Subject to questions and responses from this honorable panel, Appellant Josette Ripoll will attempt to make the following points. But for her age, Josette Ripoll would not have been fired. Age was not a harmless error, as we've heard in prior arguments today. She was highly qualified. And out of three or four years, she had the second-best test scores and the third-best test scores twice, and then the fourth-best test scores. She had an excellent evaluation. Her teachers performed well. And when former First Lady Laura Bush came to town, she gave her school, Ripoll's school, a $75,000 grant. What else we would like this honorable panel to know is that five younger principals at lower-performing schools were not terminated. Principals at lower-performing schools were not terminated, and they were younger. In fact, there were five assistant principals brought in after my client was fired. They were younger. We would respectfully suggest that what has been presented in oral argument, for oral argument, by the state, they were trying to clean up their action rather than base the argument on what the trial court found. The trial court found that there were three reasons given for age discrimination. We beg to differ with that. We're clear that age discrimination was mentioned by Ms. Ripoll to the EEOC. She was very clear in her statement, and I won't be reading much at all today, but I'll say this. Ms. Ripoll said, I believe I've been discriminated against because of my age, 61 years, in violation of the Age Discrimination in Employment Act of 1967, as amended. In that, many RSD central office staff members were and have been replaced with much younger staff members from other states. So, in effect, she was giving a reason but for her age discrimination. That was one reason given by the appellate. The second reason was given by her employers, and her employers gave many reasons. But the first reason they said, what is your test scores? This is what she was told by her supervisor. When she asked human resource director, Samantha Brown, Samantha, what's the real reason why I'm fired? The response was, and it's in the record, oh, it's about your age. You know, they don't think older people are flexible, in the record. So that was the second reason, but it wasn't my client's reason. She was merely repeating. Okay, and that's what I wanted to ask you about. Yes, yes, Your Honor. Brown. Yes. So, what evidence do we have that Ms. Brown was a participant in the decision-making process? I know she's human resources lady, but the human resources lady, for example, in the United States government, doesn't have anything to do with who I hire as a law clerk, but she sits down with them and gets their W-4 and, you know, gets their benefits set up and does all of that. So she is the human resources lady, but she doesn't have any involvement in whether I hire or fire them and who I hire and fire and how I do it. So, to me, the title human resources person doesn't answer the question of how would she, what involvement did she have in knowing the decision-making process to give that information. Is it just her opinion, or do we have evidence that she participated in some way to know that? Yes, Your Honor. Excellent question. It wasn't her opinion as just an ordinary employee. Samantha Brown was in charge of hiring and firing. Samantha Brown wasn't the... She actually is the one who made the decision to fire? No, Samantha Brown is the one who sent her a letter, yes. You sent the letter? Yes. Okay, but I can ask my secretary to write a letter. What I'm saying is, how do we tie Ms. Brown to the decision, other than just her title, which to me... Yes, thank you, Your Honor. And here's how we tie Ms. Brown to the decision. Ms. Brown's, second reason for the termination, Ms. Brown said, because your efforts were ineffective, which has nothing to do with tests, Ms. Brown also said your overall performance evaluation did not meet district standards, which is contrary to the facts. What are you reading from? Pardon me? What are you reading from? Oh, I'm sorry. I'm reading from a June 11th letter that's in the record from Ms. Brown, notifying her, notifying my client, three different reasons why she says she was fired. Where in the record is that? Your Honor, I don't have the number, but I will definitely provide it to the court. Yes. And then the fourth reason was, she did not meet the school achievement performance test. And to all your honors, the point I'm making is... Counsel, I appreciate you've got a lot of passion for your case, and I appreciate that, but I'm trying to get kind of to a bottom line. To me, the fact that a human resources person sends the letter doesn't make them part of the decision. I can tell someone else, I can tell my law clerk, please go tell Mr. X that my decision on this is something, and that law clerk can simply be a messenger, or I can say to the law clerk, you make the decision, obviously not about a case, but you make the decision on who we hire as an intern, say, and you go deal with it, and I have nothing to do with it. Yes. How do we know which one this is? Now, your honor, I don't know if this addresses specifically, but I'm going to take a shot at this. Superintendent Patrick Dobart, whose name is in the case, in terms of giving a reason, he follows up with school performance. And in particular, he says that you've been removed from the position of Schoenberg principal based on determination that you failed to competently and effectively manage the school. His words, this is the superintendent's final word. Our point, your honor, is that after my client was informed by her immediate supervisor, Monica Beaudoin, that she would be released, she asked her to put it in writing. And that's in the record, we'll show that to the court. And then Ms. Beaudoin never put it in writing. A couple months later, after my client filed an EOC complaint, then these reasons come up, and it's about four or five of them. Our position is that these reasons are pretextual in that when you look at the records of the actual performance of my clients, the 92% success in terms of her... I thought your client asked for a hearing after she was told she's going to be released. She asked for a hearing or a review of that, and it was in fact reviewed, and that's when the superintendent or the second in charge said... Here's what I know for a fact. I didn't represent her at the time. I know for a fact there was no lawyer there. I don't know, and I can't... Okay, but there was a process. Yes. Okay, so that's why there might be an evolution here in what was going on, because it starts with the supervisor saying, I'm going to release you, and then there's a process where that can be reviewed. Was there or was there not? I agree that that was part of the process, Your Honor, was that they were coming up with reasons to justify her termination because there were nine other schools with scores lower than my client's. Nine. Four of those principals were retained. Four were retained. At Craig School, at Cohen School, at Reed School, and at another school across the river. Four were retained. My client, they were younger. Not only was my client... Your Honor, the only reason why I'm explaining this is that... They were retained. How did they score? How did they score? Very good question. I have the scores right here. Okay. Walter L. Cohen, a 28. My client had a 70, and the last year was 72. Joseph Craig, a 48.3. Sarah T. Reed, a 33.7. Maury Henderson, 57.1. And they were retained. And one last point, Your Honor. And the person who replaced my client, who was 33 years old, came from Pennsylvania after having been suspended in both Pennsylvania and in Georgia. We believe, according to the facts, this is an issue that the trial court assumed that the recovered school district had a legitimate reason, but the facts are contrary to that assumption. There was no legitimate reason until after they realized that my client had filed an EOC complaint. Then they started coming up with reasons, Judge Haynes. I just want to be clear, Counselor, that in April of 2012 was when she was first told, you know, you're getting released. Verbally, yes. And then she asks for a hearing or some kind of review, and that's when Brown sends a letter and says, we're going to get you a hearing. And then she did have a hearing, according to the record, on July 2nd of 2012. I know she asked for a hearing. I did not represent her. I don't really...  You ought to know what the record is. I mean, if I know this, you ought to know. I know a hearing was scheduled. I know there was no lawyer. I know there was no lawyer. I know that. Now, did she go to a meeting? As I said... Oh, and Your Honor, very good. There's nothing in the record that justifies her termination based on a hearing. That issue was deferred to the state court. So there are two claims, to be clear. One was breach of contract and whether or not they went through the process that Judge Haynes is talking about. That's been referred to the state court. That hasn't been litigated. The only question before the trial court was whether or not because of her age she was discriminated against. So in terms of the due process, the hearing... No, I'm not asking if she got due process. I'm asking as a factual matter, was there some event on July 2nd in which Ms. Ruppel and Cruz, Nash Cruz, the chief of staff, got together and had some discussion about the topic of whether she should be kept or not? Believe it or not, I'm glad you asked that. Cruz was not a supervisor. Nash Cruz was a consultant. Yes or no? How about that? Yes or no? Did something happen on July 2nd, 2012 involving Cruz and Ruppel? Yes or no? Not that I'm aware of and not that the trial court used to say that the case should be dismissed, Your Honor. That's just my point. I don't doubt that there were some attempts made after the fact in terms of harmless error to clean up the error. But the trial court says that age was not the determinate factor. We says at least as in dispute, Your Honor. That's all I'm saying. At least it was in dispute and that my client should have her full day in court and these issues would come out, Judge Haynes, all of that would come out had she been allowed to have a full day in court. That's what we suggest with all respect. I'd like to reserve any additional time I have for rebuttal. Yes, sir. Thank you. Mr. Kessler? Good afternoon, Your Honors. May it please the court. My name is Jeffrey Kessler here on behalf of the State Defendants. This case is squarely controlled by the U.S. Supreme Court's ruling in the Gross case, 557 U.S. 167. And yet, Ms. Reiple's counsel completely glosses over it. That was the basis for the district court's decision. It's still good law and there's simply no reason not to affirm the district court's ruling, which is correct. That case held the- Yeah, the human relations doctor, I think in a statement at least, the evidence shows that they're being discharged because of age. What do you do with that? Well, first of all, it's not competent summary judgment evidence. It's merely a- she was- Ms. Reiple was referring to her statement in her own EEOC charge statement, which- Why don't you assume arguendo we're going to consider it evidence, and then if you would mind answering the merits. Okay. Assuming that it was competent summary judgment evidence- Which you dispute, I understand. Yes, certainly. Certainly. That being said, there's still the person who made the decision, Monica Boudoin. You were getting into that with what is the HR director's role. Ms. Boudoin was the director of student achievement. That is a position that ties directly to the analysis of how the teachers are performing, how the students are performing, and how the administrators are performing. Nash Cruz, the chief of staff for the RSD, also is involved in this decision. There's simply no evidence to suggest that either of them held any sort of age-based animus. Well, here's the question. What I'm trying to figure out is if Ms. Brown, she made that statement, as Judge Higginbotham noted, that's a problem for you. If we find it to be competent evidence, is there evidence in the record from which we can infer that Ms. Brown had knowledge of what the decision-maker's animus was? In other words, let's suppose that there had been a meeting with the supervisor, the chief of staff, the superintendent. They sat around saying, well, this lady's too old. She's getting old. We ought to fire her. And Ms. Brown is just sitting there. And later on, Ms. Brown tells Ms. Reupel, you would admit that'd be some evidence. If there wasn't any evidence. Assuming it was all properly presented. There is zero evidence to that effect. That's what I'm trying to find out is, assuming Ms. Brown made this statement and it's properly before us, where did it come from? Was it her own opinion or was it based upon some sort of meeting or involvement with the actual decision-makers? What does the evidence show? Because there's simply no evidence in the record as to the genesis of that statement. They had ample opportunity to request the deposition of Ms. Brown. Discovery closed. They did not request her deposition nor that of Ms. Brown. And in fact, in the discovery responses that we had attached as an exhibit to the motion for summary judgment, interrogatory number seven asked, what evidence are you relying upon to support the basis of age-based discrimination? There was no mention whatsoever of Ms. Brown's comment. There also was no mention whatsoever of Ms. Brown's alleged comment in the original petition. Now, supposedly that statement had already occurred based off of the timing of the EEOC charge. And yet, curiously, it was not even mentioned in the original petition nor in the discovery responses. In the paragraph for EEOC charge, she stated that I was told by Ms. Baldwin that I was being discharged because of my test scores. Then she says, also, I was told by Mrs. Brown that I was being discharged because of my age. So was that statement then in the actual charge, EEOC charge? Yes. The statement is in the EEOC charge. Okay. Now, there's evidence that there's case law that we've cited that says an EEOC charge is not probative, not competent evidence. That's, I believe, the Fraser v. Indiana Department of Labor case that we've cited, Johnson v. AutoZone. She made that statement in the charge to the EEOC. And did you take her deposition? We saw no technical need to do so. Well, you took no, you didn't take her deposition. Did you engage in any other discovery other than just a generalized interrogatory, tell me all your evidence? We also asked for written documents as well, and we received those very shortly before the summary judgment, the deadline for filing dispositive motions, at which point we were ready to go based off of the evidentiary record. In particular, going back, getting back to what we were getting into on the Gross case, the EEOC charge statement, on the face of it reflects multiple bases, where the statement from Ms. Boudoin saying it was because of low test scores. On the face of that, and with Gross in mind, that case held that you have the truth. Well, you were saying, there's nothing, this record, that statement comes out of nowhere. Well, it's not come out of nowhere, it's in the EEOC charge is what started all this. Now, it's a very different question about competence in the record. My question was, put aside competence, let's assume that that is evidence. What do you do with it, and what's the effect on your case? What you do with it is you apply the teaching of the Gross case. Gross says that age has to be the but-for reason, i.e., there can be no other reasons. We went all the way through discovery. It's not a case where he simply, where Ms. Gossett, how do you find that if you accept that statement on its face as I was being discharged because I was being discharged because of my age? And how do you say as a matter of, that doesn't raise an issue of fact as to whether or not you made the causation the but-for standard? That would basically allow virtually any plaintiff to simply avoid summary judgment by any plaintiff. They can do that if they swear to the statement, and the statement itself is it, because it's just a credibility. The fact that she makes it doesn't mean that it's admissible. But we do separately have to account for the multiple layers of evidence. You're giving me no answer except that it's not competent evidence. And you're not, I don't know if you're deliberately avoiding my question, but my question has been asked to you repeatedly now. It's a very straightforward one. If that statement is competent evidence, what is the impact upon your case? How can you sustain a summary judgment or grant in this case? Summary judgment is warranted because of gross, because they have identified multiple causes. But-for causation means it's the only cause. That's the teaching of the gross case. It's still good law. And meanwhile, Ms. Ripoll has totally failed to try and distinguish the effects of the gross case in her brief to this Court, or in the oral argument by her counsel. That case holds that if you're pleading multiple reasons for the decision, age necessarily is not the but-for reason. Secondly, it's well established that this Court can affirm the decision of the lower court as long as there's a basis in the record to do so. There is ample evidence in the record that we've provided legitimate, non-discriminatory reasons. And Ms. Ripoll has not satisfied her version of the show. It's still law. Any time a plaintiff pleads multiple reasons for being fired, the case can be dismissed because he's not pled but-for causation. I suggest to you that but-for causation, you misstate the but-for cause. The question is, but for that which you've been fired. And they put with us the evidence of the performances of the people, the other schools, who weren't fired. So that is competent somewhere judgment evidence. So coming back to my question, assuming the competence of that statement, what you're faced with is you have a direct statement by a person of authority. I don't know what her participation is. A great statement that this was what she was told was a reason for she was being fired. And you have the evidence that other people were not terminated who had poor performances than did she. And I would like to get into that as well. All right. We're fine. But that's the question. And I'm not fussing at you. I just need an answer. You give it to me or you don't. I've been trying to give it to you as best as I can. And the way the Supreme Court held in gross, the district court correctly applied it. It's also true that- Does it matter that Ms. Brown was or wasn't a decision maker in the process as to what the impact of her statement? Yeah. I think that matters. That's why I'm asking about that. If she was the sole decision maker and it was competent evidence, then yes, that would be an issue. Here, however, the issue is that- Is she a decision maker at all? Or is she just the implementer of human resources decisions made by other people? My understanding is she's more the implementer than the decider. The academic specialists are the director of student achievement and the chief of staff who focus more directly on those types of decisions. Okay. Now what do you do about the similarly situated, better treated younger people? Okay. First of all, there's a couple of mischaracterizations. For instance, the principal who was at Cone, which was the school that had the student performance score of 28, that individual was demoted. Now, there were some- What happened was there was a- He happened to have a very strong record in discipline and they created a separate position that's an administrative position for him. It is not an in-school position. It is not a principal position. They gave her an alternative. She could come back and teach in her- where she was cert- certificate. Where she had an area where she had a certificate. She was retained if she chose to do so, wasn't she? Yes. They offered her- So there's no difference there. Right. Right. And also, if you look at the ages of the individuals who were discharged at the time, the hiring and retention decisions, four of the six who were retained were over age 55, I believe. I'm sorry. Four of the six who were retained at- four of the six principals of RSD schools who were retained were over age 55. Conversely, three of the six who were discharged- What do you mean by over 55? Is it 110? It was just trying to get a meaningful comparison. What is the difference between being 55 and 65? I don't- Not much. She was 61. She was 61.  their late 50s. They were just trying to get her general, you know, peer group, so to speak. That's correct. They were just trying to get her general, you know, peer group,  That's correct. You were going to say three of six- I believe it's three of six who were discharged were under age 55. Age was simply not a factor. Secondly, there's ample evidence that we've put in the record that has gone wholly unrefuted regarding the failure to meet her school's performance goals. For instance, the-    younger who were then retained in the same position? No. No. No. No. No. No. No. No. No. No. I thought all these schools were underperforming first. I thought generally, I don't know what this particular school district is. I'd be surprised if any of them didn't make the best of test scores. Right. Well, part of the problem is that- What is it? What are the facts? Were the other schools performing or not? Some were performing better than others. Some were improving their performance. Her school was stagnating, and that's why it got downgraded from a degrade based off of the school performance score to an F grade on her watch. But they kept changing the metric. I mean, it went from being a C grade to an F grade, I think, the 70 or something like that. So, if you're basically performing at an average level, and then they change what's average to be what used to be a B, well, that becomes difficult, right? I mean, part of this is you've got different, you know, areas of the community that have challenges, and some students are, you know, in areas where the performances are not as good, and so on. And so, it isn't all the principals doing. I mean, there's only so much you can do with the resources you have and the, you know, situation, and maybe sometimes there's absent parents and so on. So, there's a lot that goes into whether a student performs well, only one aspect of which is the principal. Right. But also, you look at the pattern over time, and over two years, there was virtually no change in the school's SPS score. Her goal was to improve the SPS score by ten points per year, and over time, that, when you get into the sliding scale, the RSD was not content with mediocrity. They wanted to improve the standards and to force improvement. So, the other schools weren't meeting those goals. Yeah. And it's not based off of a single up or down decision, a single snapshot in time. The 28.4 figure for the Cone School was just that particular year. There's no evidence in the record that it was over two years before. And that principal was demoted in any event. When we look at the record in this case, we're going to find that these other schools here, that those particular principal schools performed better than the plaintiff in this case and met their goals. You already said some of them didn't meet their goals either, although I'm not real clear about that. She failed the state test. How many of these other people passed the test that she allegedly failed? Each school had their own sets of goals based off of where they were. There's no evidence in the record as to what goal in particular a particular school had, but there is obviously the evidence regarding the overall score, what the RSD expected over time. They expected progress and improvement. The fact that Schaumburg did not improve on Ms. Rifle's watch ultimately led them to fall below the D grade threshold because of the stagnating performance. The schools all had different requirements to be met. In other words, somebody assigned each school some kind of goal and there were different goals. I'm not sure how much of a comparison you get out of that. I believe it's somewhat of an organic process because, as you noted, Judge Haynes, some of the schools are starting off at different levels than others. Her school, Schaumburg, started off at a relatively higher level than the average RSD school, but while the average RSD school was improving, Schaumburg was flatlining. But, I mean, if I'm getting a 93 on a test all the time and the highest grade's a 100, it's harder for me to improve than Mr. X over here who started at a 20 and now we're trying to get him to a 30. The SPS is not a percentage. I believe it's out of 200. I'm not 100% certain, but it's not simply a percentage score. In any event... Some sort of grade, but I'm saying the higher your grades, the harder it is to improve them, okay? But if you're still getting... Judge Higginbotham knows that because he always made A's, so he just couldn't improve. I suspect you all made A's. But that being said, it was a degraded school. There still was ample room for improvement. The improvement was not made. Judge Dennis made A pluses, by the way. Excellent. So, and then in turn, the failure to meet the performance goals ties into the ADEA prima facie case analysis. I wanted to refer specifically to the Williams v. Taco Bell case, which I believe Judge Higginbotham, you were on the panel for that one, where a store manager failed to meet the goals set by management. They held that not only did he ultimately lose on summary judgment, he was not even deemed qualified for performance  And so that was a failure for purposes of making a prima facie case. In this instance, we contend that the fact that Ms. Reipol did not meet her stated goals of ten points of improvement in the SPS score, as well as improvement on the ILEAP tests. There were 24 test subgroups, six grades, four subjects. They only improved by ten points in five of the 24, and there were significant problems. There were reductions in the scores in some of them. Also, the evidence is clear that she had trouble evaluating her staff competently, and they had to override her personnel decisions more so than any other principal in the RSD. In fact, if you remove the second highest school, second highest number of instances, the number of instances where they overrode her recommendation is equal to the ten remaining schools. Out of the 13 faculty members, 42% of the faculty, she said, oh, yeah, they're fine, let's keep them on. RSD, after looking at the data, says, no, they are not doing their job. One of them was a teacher whose value added was in the second percentile. She said, that's good enough, let's keep them. That teacher also had 24 absences. These details are set forth in the exhibits to the summary judgment motion. Their sites are in the record on this. Another one was a PE teacher who had poor classroom management that had, quote, unquote, significant consequences in the past. Again, she thought that was okay, said, let's keep them on for another year. RSD overrode that decision. There were 11 other teachers who were similarly poorly performing, and she said, good enough to let them go on. Part of the job of a principal is to competently evaluate the staff and to implement the RSD's vision. And in this instance, her personnel record was markedly worse than any of the other principals at any other school based on that. Did she accept the teaching position? She declined the teaching position. Where is she now? I don't know. You'll have to ask opposing counsel that. I assume she's in the courtroom, but yes. Why don't you also refer... I didn't mean now. Yes, I understand, Your Honor. I want to get back on the comparative credentials point where he was saying, where Ms. Ripoll argues that she was far more qualified than Ms. Alston, the individual who replaced her. Under Fifth Circuit law, it's a very highly deferential standard to the employer. In the Moss v. BMC software case, which we cited in our briefs, it held the ADEA was not intended to be a vehicle for judicial second-guessing of employment decisions, nor was it intended to transform the courts into personnel managers. The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from those decisions which are unlawfully motivated. You don't have to agree that the decision to hire Ms. Alston was necessarily correct. You just have to say that you have to examine whether there's proof of age-based discrimination. There were a number of very positive factors for Ms. Alston. Her teacher recommendations that she received, she had a strong record of achievement in an urban setting. She was teaching in Philadelphia, and her reading scores improved from 19% to 50% in a single year. She also was a leader in the curriculum, designing the curriculum. She was taking a leadership role. The RSD could reasonably conclude that her potential... How is her school doing? They ultimately converted the school after that year to a charter school, and they did not issue an SPS score for that year, so I cannot say. I see that my time is just about up. Thank you, sir. Thank you. Mr. Sanders, you have five minutes on the button. Thank you. Thank you. Judge Haynes, to answer your question, how did her school do? That school went down to a 55. Ms. Brepo was at 72. That school went down to a 55. I just happened to have that number. Also, in terms of overriding my client's recommendation, the information I have is that teachers scored as proficient by my client were terminated by the RSD and replaced by young, inexperienced, out-of-state teachers. Okay. Where are you getting that from? I was explaining... I know that, but where are you... My client gave me that. And is it in the record? Can you give it... You know, we go on record sites, sir. I apologize. I had the answer because the question was asked, and that's where I got the answer. You're saying you just know it from your client. You don't have it in the record. Oh, I'm sure it's in the record, Your Honor. And I will if the court allows. We will present it if the court allows it. You might want to take another look at whether there was a July 2 event, by the way. Was that what, Your Honor? Go ahead. It's all right. All right. Now, also, the statement was made that my client was given the job teaching. What is in the record is a July 31 letter that says, Unfortunately, due to district reorganization stemming from budget restraints, shifting student enrollment, et cetera, your position is no longer available. She was fired as a teacher in that first job. She was fired from Johnson Elementary. That's in the record. Judge Higginbottom, you ask, What about the principals at the other schools? What happened to them? One was given a newly created position in Baton Rouge, which is in the record, over student discipline, making about basically the same amount of money. One was given an assistant principal's job, principal from Craig. Another was transferred as an assistant principal at Sarah Reed. And a third... How old were all these people? They were younger than my client by at least ten years. All of these were younger, and these were the low scores. And the other one remained as a principal. These are the schools with a 28, a 48, a 33, and a 57. So that's what happened to them. I also heard your Honor ask about the EEOC record. This was early on in our pleadings, all in the records about EEOC. And the statement I read came from the EEOC document about Ms. Brown. So that's in the record. They didn't question it then, but now they question it in terms of Ms. Brown's authority. That's in the record. Also in the record, my client was replaced by five... Not replaced, but RSD hired five younger assistant principals, age 36, age 35, age 34, age 46, age 34. This is in the record coming from EEOC. They admitted to this to EEOC. So that was a trend of bringing in younger people. Now, in terms of my clients and her work, she started out with the 61. The RSD average was 54. Then she went to 61, which was second in the whole RSD. So there were a lot of bad schools. My client was second. Then she went to a 70, and at that point she was third. And the same happened in 2010, 2011. She was third out of a lot of bad schools. And then she ended up being fourth the year that she was terminated. We respectfully suggest that while these facts are not all together yet because we never had a trial, we think that the summary judgment motion was premature because there's a Was the discovery closed by the time the decision was made? Was it closed? Yeah. I don't think so. They thought they had a strong case for summary judgment, and they filed their motion for summary judgment. That's what happened. But you didn't ask for discovery that you didn't get, right? No, that wasn't the problem. I had enough to show that we had a strong case. They apparently didn't get enough information because these issues are still in dispute. And that's the point. If we have discovery, if we have a trial, everything will be answered. And we think the court that you all have allowed oral argument, I have 40 seconds, and I'm going to stop unless there's a question from either of you. It's been a long day. Not for me, but for you all. Thank you. I was going to say, for all of us. Thank you. Well, both of y'all have a lot of energy for this hour. Okay. That concludes our oral argument today. We take these cases on as